**STATE of Missouri ex rel. John ASHCROFT, Attorney General, Plaintiff-Appellant,**

v.

**MARKETING UNLIMITED OF AMERICA, INC., d/b/a Handicapped Assistance League of America, Inc. et al., Defendants-Respondents.**

No. 41209.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 27, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 13, 1981.

Application to Transfer Denied
April 6, 1981.

Martin E. Grambow, Asst. Atty. Gen., St. Louis, for plaintiff-appellant.

Lester W. Duggan, Jr., St. Charles, for defendants-respondents.

SIMON, Judge.

An action for an injunction, restitution and appointment of a receiver was brought in November 1977 by the Attorney General of the State of Missouri under the authority of the Merchandising Practices Act, Chapter 407 RSMo Supp. 1975,[1] against Marketing Unlimited of America, Inc. (Marketing Unlimited), Richard A. Schirmer (Schirmer), Seldon P. Kanaday (Kanaday), and Paul C. Santhoff (Santhoff). Personal jurisdiction was not obtained as to Marketing Unlimited and Kanaday. They are not parties to this action. In its petition, the Attorney General alleged the violation of § 407.020. The trial court rendered its judgment in favor of the defendants Schirmer and Santhoff on the ground that the evidence was insufficient to show that the defendants violated the statutory provisions of Chapter 407. The Attorney General appeals. We reverse.

The Attorney General of the State of Missouri contends the trial court erred (1) in that its conclusion of law that the facts do not support a violation of Chapter 407 sufficient to render defendants individually liable is against the manifest weight of the evidence; and, (2) in declaring that a breach of contract is not an unlawful act constituting a violation of Chapter 407. We shall set forth the facts in detail.

Marketing Unlimited was incorporated as a Missouri corporation on March 21, 1977. The stated corporate purposes were to manufacture, sell and distribute "cactus eggs" and related programs and merchandise; to engage in any businesses or pursuits permitted by law and its board of directors; and to perform all that is necessary and incidental to those purposes. The offices of Marketing Unlimited were located at 734 West Port Plaza, St. Louis, Missouri. Schirmer was the president and Santhoff was the vice-president and a salesman for the company.

The Handicapped Assistance League of America, Inc. was a partnership between Schirmer and Kanaday. According to Schirmer, the purpose of the partnership was to sell vending machine routes for mints that had been made by handicapped persons. The Handicapped Assistance League was never registered with the Secretary of State as a domestic or foreign corporation, nor under the Fictitious Name Act. Its office was the same as Marketing Unlimited's.

The defendants were charged with a violation of Chapter 407, in particular § 407.-020 in the operation of two sales schemes. The first concerned the sale of "cactus egg" distributorships. The second concerned the sale of mint candy distributorships.

On March 9, 1977, Mr. Hamilton of College Park, Georgia met with a Mr. Hughes who identified himself as an agent of Marketing Unlimited. Mr. Hughes represented Marketing Unlimited as a distributorship operation which would furnish retail locations in the Atlanta area for a cactus egg product which are sold in racks. Mr. Hughes told Mr. Hamilton that for an initial investment of $4,500 he would receive 4000 cactus eggs, 20 racks and 20 locations. A handicapped woman would establish the retail locations for Mr. Hamilton, and assist him in placing the racks and the product in the locations. Mr. Hamilton's job would be to service the racks and collect the money. Mr. Hughes also told him that if he had not recouped his investment within six months, the remaining inventory would be repurchased by Marketing Unlimited at its initial cost.

On March 11, 1977, Mr. Hamilton signed a contract for the purchase of a distributor-

1. All statutory references will be to RSMo Supp. 1975 unless otherwise noted.

ship worth $9,000, which was to include 8000 cactus eggs, 40 racks and 40 locations. After paying the $9,000 demanded in advance, Mr. Hamilton received a copy of the contract and the guarantee of repurchase. When he did not receive his cactus eggs and racks within 10 days as he was promised, Mr. Hamilton wrote Schirmer asking him to honor the contract. Hamilton eventually received 1000 eggs in June, 7000 eggs in August or September and the racks in October. Retail locations were not established, nor was his original inventory repurchased.

Mr. John Marr of Charlottesville, Virginia came in contact with Marketing Unlimited at an "Own Your Own Business" show. He too, met with a Mr. Hughes who identified himself as an agent for Marketing Unlimited. Substantially similar representations were made to Mr. Marr as were made to Mr. Hamilton. On or about March 31, 1977, Mr. Marr signed a contract for the purchase of a cactus egg distributorship worth $2,250, with payment in advance. For his investment Mr. Marr was to receive 2000 cactus eggs, 10 display racks and 10 retail locations. When Mr. Marr failed to receive anything within 15 days as promised, he contacted Mr. Hughes who gave him Schirmer's home phone number. Mr. Marr called the number several times and spoke to a man who identified himself as Dick Schirmer. In their initial conversation Mr. Marr was told that the cactus eggs would be delayed because of production problems. Subsequent telephone conversations produced nothing but more words of delay. Late in April Mr. Marr did receive his cactus eggs. However, he never received his racks, retail locations and his initial inventory was never repurchased.

The evidence indicates that sometime in June, 1977, Marketing Unlimited ceased selling distributorships for cactus eggs and began selling distributorships for the sale of mint candies through vending machines established in retail locations.

In early June of 1977, Bobby Watson's response to a newspaper ad prompted Santhoff to visit Mr. Watson's home. Santhoff identified himself as a representative of Marketing Unlimited. He told Mr. Watson that in exchange for an investment of $3,750, he would receive 25 vending machines and locations in an area of Mr. Watson's choice and approximately 536 pounds of mint candies supplied by the Handicapped Assistance League and company support. Mr. Watson was to service the machines and collect the money.

On June 2, 1977, Mr. Watson signed a contract and gave Santhoff a personal check in the amount of $300 as a down payment. The contract stated that his relationship with Marketing Unlimited would be in the nature of a partnership. He was also given a certificate of guarantee to the effect that if he did not make a return on his investment within six months, he could get a full refund. Santhoff returned to Mr. Watson's house the next day with the contract and told him that he had been accepted as a partner. Santhoff then asked for the balance of the money. Mr. Watson stated that he would pay only half of the balance in advance, and the other half when the route was set up. Mr. Watson personally went out to the West Port Plaza office and gave Schirmer a cashier's check made payable to Marketing Unlimited in the amount of $1,575. Schirmer then told Mr. Watson that he had to have the rest of the money in advance to establish the vending machine routes. On June 14, 1977, Mr. Watson mailed another cashier's check to Schirmer for the balance. The check was made payable to Marketing Unlimited and was subsequently deposited in the company's account with the First Missouri Bank and Trust Company of Creve Coeur together with the other check. When Mr. Watson did not receive what he was promised, he called Schirmer who told him that he was having trouble getting the machines and locations but that he had the candy. Mr. Watson failed to receive any machines, candy or locations, and received no refund of his investment.

In early June of 1977, James Deliberto of St. Louis met with Santhoff after answering a newspaper ad. Substantially similar representations were made to Deliberto as

were made to Mr. Watson. Mr. Deliberto signed a contract and gave Santhoff, in advance, a total of $3,750 in cashier's checks made payable to Marketing Unlimited. The contract stated that Mr. Deliberto's relationship with Marketing Unlimited would be in the nature of a partnership. It also stated that for his investment Mr. Deliberto was to receive 25 vending machines at 25 locations and approximately 500 pounds of candy. Although he was to receive the candy and machines within 30 days, it was "a couple of months" before the machines and about 200 pounds of candy were delivered to him.

In late August, when Deliberto still had not received his locations, he called Santhoff demanding a return of his money. Santhoff refused to acknowledge that he knew him. Mr. Deliberto never received the 25 retail locations, the rest of his candy or a refund.

Janis A. Reis of Holdrege, Nebraska met with Santhoff on July 6, 1977. She too learned of Marketing Unlimited through a newspaper ad. Santhoff identified himself as the vice-president of Marketing Unlimited and presented her with a business card stating the same. Substantially the same representations were made to her as were made to Deliberto and Watson. Mrs. Reis signed a contract with Marketing Unlimited which stated that for an investment of $3,750 she would receive locations, machines and approximately 586 pounds of candy. It also stated that the agreement would be in the nature of a partnership with the company. She also received a refund guarantee. Santhoff signed and accepted the contract on behalf of Marketing Unlimited as vice-president. Mrs. Reis paid the $3,750 in cashier's checks.

When she received nothing, Mrs. Reis called the West Port Plaza office several times speaking to several individuals, but to no avail. She did not receive any machines, locations, candy or a refund of her investment.

On July 19, 1977, Mr. Earl Hanneken of St. Louis, Missouri entered into an agreement with Marketing Unlimited, after meeting with Mr. Green, a salesman for the company. The contract, similar to the others, stated that he was to receive machines, candy and locations provided by handicapped persons for an initial investment of $3,750 in advance. He too, received a refund guarantee.

When he did not receive his goods on the day promised, Mr. Hanneken called the company's office several times, obtaining nothing but more promises. He then made several visits to the office. Schirmer told Mr. Hanneken that they were having trouble finding handicapped people to establish locations. In the latter part of August or early September, he received the candy and the machines. But, when he failed to receive any locations, he continued to call the office of Marketing Unlimited. When Mr. Hanneken threatened to go to the prosecuting attorney, Schirmer told him that Kanaday had the 25 locations "in his pocket" and that he would get them as soon as Kanaday arrived back in town. Mr. Hanneken never received his locations.

In late July, 1977, Gale and Patty Cook, husband and wife, met with Dale Hughes after responding to a newspaper ad. Mr. Hughes identified himself as a salesman for the Handicapped Assistance League, a non-profit organization that employed handicapped persons to establish vending machine locations for the sale of candy they made.

On July 28, 1977 the Cooks signed a contract. The contract provided that for $3,750 they would become partners with the company, receive 25 vending machines and routes set up by handicapped people, and 300 pounds of candy. Mr. Hughes told the Cooks that if they failed to recoup their investment within a year, they would get a full refund. The Cooks paid the money in advance by cashier's check. When the Cooks did not receive anything by late August, Mr. Cook called the company's business office and talked to a man who identified himself as "Dick Schirmer." He told Mr. Cook that it would be weeks before he would receive his machines. The Cooks never received anything for their investment and their money was never refunded.

In summary, the basic provisions in the written contracts provided that in return for the payment, the individuals would be provided with retail outlets, machines or racks, and mint candy or cactus eggs. They testified as to the agreement to repurchase the inventory or to refund their investment.

No evidence was presented on behalf of either Santhoff or Schirmer at trial. Defendant Santhoff withdrew his offer to testify following an objection made by the Attorney General under the authority of *State ex rel. Pulliam v. Swink*, 514 S.W.2d 559 (Mo.banc 1974) on the ground that Santhoff refused to testify at a deposition relying on his constitutional privilege against self-incrimination. No further attempts were made by either defendant to present evidence, and each defendant rested his case.

The trial court rendered judgment in favor of the defendants and made specific findings of fact and the following conclusions of law:

1. Chapter 407 RSMo 1969 as amended (Supp.1975) is applicable to all aspects of this lawsuit.

2. Under Missouri law, officers of a corporation may be held individually liable.

3. A violation of Chapter 407 RSMo 1969 as amended (Supp.1975) would be an unlawful act capable of rendering a corporate officer individually liable.

4. The findings of fact do not support the conclusion that defendants Schirmer and Santhoff violated Chapter 407.

5. The findings of fact do offer proof of several breaches of contract and unkept promises by the defendants. However, a breach of contract is not to be equated with an unlawful act which constitutes a violation ·of Chapter 407 RSMo 1969 as amended (Supp.1975).

6. There is insufficient evidence capable of rendering defendants Schirmer and Santhoff individually liable."

The state's first point is that the trial court's conclusion of law that the facts do not support the conclusion that defendants Schirmer and Santhoff individually violated the provisions of Chapter 407 RSMo Supp. 1975 is against the weight of the evidence. Specifically, we are faced with the question of whether the acts of the defendants constitute unlawful practices as defined in § 407.-020. Section 407.020 provides, in pertinent part, as follows:

"The act, use or employment by any person [2] of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale [3] or advertisement of any merchandise,[4] is declared to be an unlawful practice; ...."

The standard for review of court tried cases is well settled. We shall affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976).

The disposition of this point centers upon two issues. First, did the conduct of Schirmer and Santhoff constitute "unlawful practices" as defined in § 407.020, and second, the propriety of holding them individually liable. We shall address these issues in the order stated.

2. "Person" is defined by § 407.010(5) as "any natural person or his legal representative, partnership, corporation, domestic or foreign, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof."

3. "Sale" is defined by § 407.010(6) as any sale, offer for sale, or attempt to sell merchandise for cash or on credit.

4. "Merchandise" is defined by § 407.010(4) as "any objects, wares, goods, commodities, intangibles, real estate or services."

■ The purpose of Chapter 407 was discussed by our brethren in the Western District in the case of *State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362, 368 (Mo.App.1973) wherein they stated:

"The purpose of these statutes is to supplement the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play and right dealings in public transactions. In order to give broad scope to the statutory protection and to prevent ease of evasion because of overly meticulous definitions, many of these laws such as the Missouri statute 'do not attempt to define deceptive practices or fraud, but merely declare unfair or deceptive acts or practices unlawful . . .' Commerce Clearing House Poverty Law Rep., Vol. 1, ¶ 3200, leaving it to the court in each particular instance to declare whether fair dealing has been violated."

Therein it was held that the language of § 407.020 does not require that the elements of common law fraud[5] be proven to establish unlawful practices under § 407.020. The injunctive relief provided for in § 407.-100 is remedial, not punitive, and therefore the statutes should be given a liberal construction. *State ex rel. Ashcroft v. Wahl,*

600 S.W.2d 175, 180–181 (Mo.App.1980). This interpretation is consistent with other jurisdictions' holdings with substantially similar consumer protection statutes. The New Jersey Supreme Court, in the case of *Fenwick v. Kay American Jeep, Inc.*, 72 N.J. 372, 371 A.2d 13 (1977), construing that state's Consumer Fraud Act,[6] held that the "capacity to mislead is the prime ingredient of deception" and that intent to deceive is not an essential element of an offense under the act. Id. at 16. The court stated:

"Since consumer protection is the ultimate goal, the standards of conduct established by the act and implementing regulations must be met regardless of intent except when the act specifically provides otherwise."

Delaware courts have also held that fraudulent intent is not requisite to the availability of relief under Delaware's statute.[7] *Nash v. Hoopes*, 332 A.2d 411 (Del.Super.Ct. 1975); *In re Brandywine Volkswagen Ltd.*, 306 A.2d 24 (Del.Super.Ct.1973) aff'd sub nom. *Brandywine Volkswagen Ltd. v. State*, 312 A.2d 632 (Del.1973). Arizona courts have consistently held that the elements for a claim for relief under their consumer protection act[8] are not identical to those of a

---

5. The elements of common law fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) the speaker's intent that his statement be acted upon and in a manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Twiggs v. National Old Line Insurance Co.*, 581 S.W.2d 877, 880 (Mo.App.1979).

6. N.J.Stat.Ann. Sect. 56:8–2 (Supp.1980) provides in part that:
   "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

7. Del.Code Tit. 6, Sect. 2513 provides in part:
   "(a) The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice."
   Sect. 2512 provides "[t]he purpose of this sub-chapter shall be to protect consumers and legitimate business enterprise from unfair or deceptive merchandising practices . . ."

8. Ariz.Rev.Stat.Ann. § 44–1522 provides:
   A. The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

common law fraud action. *Murry v. Western American Mortgage Company*, 124 Ariz. 387, 604 P.2d 651, 654 (1979); *Parks v. Macro-Dynamics Inc.*, 121 Ariz. 517, 591 P.2d 1005 (1979). Thus, the courts of other jurisdictions have also interpreted these statutes liberally so as to effectuate their public purpose. To determine whether fair dealing has been violated is a determination which must be made upon the examination of the facts of each case. *State ex rel. Danforth v. Independence Dodge, Inc., supra.*

■ Applying this standard to the record before us, we find that the facts clearly establish the use of false promises and deception in connection with the sale of the distributorships.

The facts clearly show that the following persons entered into contracts with either Marketing Unlimited or the Handicapped Assistance League: Robert Hamilton, March 11, 1977, John Marr, March 31, 1977, Bobby Watson, June 4, 1977, James D. Deliberto, June 10, 1977, Janis Reis, July 6, 1977, Robert Hanneken, July 19, 1977, Patty Cook, July 28, 1977. Each of these individuals paid, in advance, the amount stated in the contracts, expecting to receive what they had contracted for and been promised. Mr. Hamilton received only his cactus eggs and racks. Mr. Marr received only his cactus eggs. Mr. Deliberto received only his vending machines and a portion of his candy. Mr. Hanneken received only his vending machines and candy. Mr. Watson, Janis Reis and Mr. and Mrs. Cook received nothing. The evidence clearly shows that Schirmer was aware of the transactions involved here and participated therein. The contracts with Watson, Deliberto and Hanneken were accepted by Schirmer, whose signature appeared at the bottom of those documents as president. The trial court's ninth finding of fact stated that "Schirmer had personal knowledge of the representations made to the purchasers of 'cactus egg' distributorships. Defendant Schirmer also had personal knowledge that said purchasers did not receive all that was promised to them in their contracts nor all that was represented to them by Marketing Unlimited's agents."

Santhoff held himself out as vice-president of Marketing Unlimited verbally, through business cards and in signing a contract on behalf of Marketing Unlimited and in a letter to Janis Reis congratulating her on joining the organization. He dealt personally with James Deliberto and Bobby Watson in June of 1977, and with Janis Reis in July of 1977. He received checks from these individuals on behalf of Marketing Unlimited. Santhoff told Mr. Deliberto that if he had any difficulties the company would work with him, and that if he was not satisfied he could have his money back at anytime. Yet, when Deliberto called, Santhoff did not acknowledge that he knew him despite the fact that Santhoff had been to Mr. Deliberto's home and had taken Mr. Deliberto and his wife to dinner. Santhoff entered into a contract with Janis Reis, aware of the prior unsatisfied customers. He told Janis Reis that the company had 50 locations from which she could pick 25. Yet, she received nothing.

Representations were made by each of the defendants that the companies they represented benefited handicapped people. The written contracts signed by Mr. Watson, Mr. Hanneken, Mr. Deliberto and Ms. Reis, state that the "Handicapped Assistance League . . . is an organization owned and operated by physically handicapped people." It was represented to the individuals involved herein that a handicapped person would establish retail outlets for the vending machines.

The evidence presented at trial showed that no retail outlets were established by handicapped persons or anyone else. Marketing Unlimited did not have in its employ a handicapped person. It is significant that

B. It is the intent of the legislature that, in construing the provisions of subsection A of this section, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to §§ 45, 52 and 55(a)(1) Title 15, U.S.C.A. of the federal trade commission act.

the defendants continued to participate in the procuring of additional contracts with knowledge that previous contracts were not fulfilled. It is also significant that Schirmer continued to use money in the corporation bank account for his personal benefit in the face of unkept promises to return investment monies and to repurchase unsold inventory. The defendants' statements, the partial performance and non-performance of the contracts by Marketing Unlimited and the Handicapped Assistance League of America, Inc. constituted the type of practices our legislature intended to declare unlawful.

The next issue is whether defendants can be held liable in their individual capacities. Santhoff[9] contends the trial court was correct in its conclusion because the Attorney General did not offer any evidence as to Santhoff's state of mind as he was making his representations to his various clients and therefore, did not establish a violation of Chapter 407 sufficient to render him individually liable. Santhoff's position cannot be sustained.

■ Under the statutory scheme, the definition of "person" clearly indicates a legislative intent to subject those "persons" who have engaged in unlawful practices to the remedial provisions of § 407.100. This is true whether they are officers, salesmen or employees of a corporation or acting in their individual capacity.

■ There can be no dispute that Schirmer and Santhoff come within the definition.

We have already held that § 407.020 is not to be limited by our common law definition of fraud. Section 407.020's only reference to a person's state of mind is contained in the phrase "with intent that others rely upon such concealment, suppression or omission [of any material fact] in connection with the sale or advertisement of any merchandise, ..." The person's state of

mind is not determinative of the other acts declared to be an unlawful practice. In the present case we are not concerned with the concealment, suppression or omission of a material fact.

Section 407.100 provides in part:

"If the court finds that the person has engaged in or is engaging in any method, act, or practice declared to be unlawful by sections 407.010 to 407.130, it may make such orders or judgments as may be necessary...."

In the present case, it is not the person's intent that is determinative of the applicability of the remedial provisions of Chapter 407 but rather that the defendants' conduct constituted unfair practices. We do not hold defendants subject to the remedial provisions for the acts of Marketing Unlimited or the Handicapped Assistance League of America, Inc. but for their own conduct.

The trial court's conclusion of law that the findings of fact do not support the conclusion that defendants violated Chapter 407 and cannot be held individually liable is erroneous and cannot be sustained. Pursuant to our holding on point one, it is not necessary to review the Attorney General's other allegation of error.

■ The defendant Santhoff in his brief alleges two points of error committed by the trial court. The first is that the trial court erred in denying his motion to dismiss based on the Attorney General's failure to comply with the notice requirements in Chapter 407 actions. The second is that the trial court erred in admitting into evidence testimony relating to out-of-state business transactions.[10] However, neither defendant filed a notice of appeal as is required by Rule 81.04 (1978). The filing of a timely notice of appeal is mandatory and is jurisdictional. *Rahhal v. Mossie*, 577 S.W.2d 143, 145 (Mo.App.1979). Accordingly these points are not before this court.

---

9. Schirmer did not file a brief.

10. During the course of the trial various state exhibits were received into evidence "subject to objection". No final ruling was ever made.

It is apparent from the trial court's findings of fact and conclusions of law that these exhibits were admitted into evidence and we will consider them so.

The judgment of the trial court is reversed with directions to enter orders and judgments in accordance with this opinion.

SMITH, P. J., and SATZ, J., concur.