STATE of Missouri, ex rel., William L. WEBSTER, Attorney General, Plaintiff/Appellant Cross–Respondent,

v.

Bradley EISENBEIS, Defendant/Respondent,

and

Rogue Creek Valley, Inc., and Stuart McCaleb, Defendants,

and

James Higgins, Defendant Cross–Appellant.

No. 54416.

Missouri Court of Appeals, Eastern District, Division Four.

June 27, 1989.

Rehearing Denied Aug. 1, 1989.

Peter Lumaghi, St. Louis, for State ex rel. Webster.

William J. Fletcher, Kirkwood, for James Higgins.

Dana A. Hockensmith and Carol Kennedy Bader, St. Louis, for Rogue Creek Valley, Inc.

SATZ, Judge.

In this action, the state charged defendants with violating our Merchandising Practices Act, Chapter 407, RSMo 1978, in their development and marketing of lots in a recreational area. Defendants are Rogue

Creek Valley, Inc.; its president and sole shareholder, Bradley Eisenbeis; its vice-president and secretary, Stuart McCaleb; and its chairman, James Higgins.[1] In the jury waived trial below, the trial court granted a "motion for directed verdict" made jointly by defendants Eisenbeis and McCaleb and entered a default judgment against defendant Higgins. A "consent" judgment was entered against the corporate defendant Rogue Creek Valley, Inc. The state appeals the judgment in favor of defendant Eisenbeis, and defendant Higgins appeals the default judgment. The appeals have been consolidated. We affirm.

The Merchandising Practices Act supplements the definition of common law fraud in an attempt to preserve fundamental honesty and fair dealing in public transactions. *State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362, 368[9] (Mo. App.1973). To prevent easy evasions, the Act purposely does not expressly define the deceptive or unfair conduct made unlawful but simply declares deceptive and unfair conduct to be unlawful and leaves it to the courts to decide whether fair dealing has been violated. *Id.* at 368. Thus, the Act declares as an unlawful practice:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ...

§ 407.020.1, RSMo 1978.[2]

In its petition against the defendants, the state made three basic charges. First, the defendants misrepresented to potential buyers the completion date of various aspects of the development. Second, various facilities and utilities were not provided by defendants as promised, because money generated by the sale of the lots was diverted by defendants to other business interests without corresponding benefit to the development. Third, misrepresentations were made that "no liens or encumbrances existed on [the] lots at the time of their sale, when, in fact, liens and encumbrances existed on the lots prior to their sale." Based upon these allegations, the state requested various kinds of injunctive relief as well as civil penalties "of not more than one thousand dollars for each violation" of the Act. At the close of the state's case, defendants Eisenbeis and McCaleb moved for a directed verdict on the grounds there was neither sufficient evidence to "tie them individually" to any of the alleged violations or "to show any false or deceptive practices." Their motions were granted. The state's appeal of the judgment in favor of Eisenbeis followed.

We review the grant of a directed verdict in a court tried case as a submission on the merits. *Wyrozynski v. Nichols*, 752 S.W.2d 433, 436–37[3,4] (Mo.App.1988). Therefore, we view the evidence and permissible inferences in the light most favorable to the judgment. *St. Charles County v. McPeak*, 730 S.W.2d 611, 612[1] (Mo.App. 1987).

In the early 1970's, William J. Rummel (Rummel), president of the Oak–Land Development Corporation (Oak–Land), began developing a resort development in Washington County. He called the development Somethin' Green. By 1982, he had completed two lakes and begun a third. He had also completed some roads and provided for utilities to most of the lots in the area around the first two lakes. Rummell sold 170 lots in the development.

In June, 1982, Oak–Land sold the development to Rogue Creek Valley, Inc. Eisenbeis was the incorporator and may have been the "sole owner" of the latter corporation. After the sale, the name of the devel-

---

1. In its petition, the state refers to Higgins as the "individual who held the position of chairman of Defendant rogue [sic] Creek ...". This allegation was not denied.

2. Subsection 407.020.1 was revised in 1985. In that revision the sentence, "Any act ... declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation" was added at the end of the paragraph.

opment was changed to Rogue Creek Valley.

As payment for the development, Eisenbeis, as president of Rogue Creek Valley, Inc., gave Oak–Land a promissory note in the amount of $780,000. Monthly payments were to be made on the note. The amount of each payment was a function of the amount of principal and interest received during the previous month by Rogue Creek Valley, Inc. from sales contracts, notes and deeds of trust generated by the sale of lots. Incorporated into the note was the purchase agreement which provided that, as part of its security, Oak–Land would take back a deed of trust on some of the unplatted property. After the note was signed, Rummel, as president of Oak–Land, assigned the note to himself and his wife. The sale of lots in the area encumbered under the terms of the purchase agreement is integral to this case.

The Rogue Creek Valley development was managed on a daily basis by Kelly Winfield (Winfield). Winfield was also the first sales manager at Rogue Creek Valley. In that capacity, he conducted the meetings of the sales staff. At the end of 1983, Winfield left. The record does not show that his replacement made any changes in the operation of the development or in the sale of lots.

From the time Rogue Creek Valley, Inc. took over sales until its sales office closed in June 1984, the Rogue Creek Valley sales force sold approximately 455 lots. When a lot was sold in the development, the purchaser would receive a sales contract signed by the salesperson and an Intrastate Exemption Statement signed by Eisenbeis.[3] The general warranty deeds received by the purchasers were signed by Eisenbeis as grantor. In showing the lots, salespeople made various statements concerning the completion dates for the third lake, the utilities, the roads, and for the various facilities and amenities.

Of the lots sold by Rogue Creek Valley, Inc., approximately ninety were in the area covered by the deed of trust. The purchasers of these lots, however, were not informed of the lien, and, in fact, the Intrastate Exemption Statements explicitly stated there were no liens on the property. In 1984, Rummel was made aware of the sale of lots in the area covered by the deed of trust. He contacted an attorney who in June of that year sent letters to those purchasers informing them of Rummel's lien on the property. Rogue Creek Valley, Inc., then sued Rummel to release the deed of trust as to those lots. A settlement was reached, and Rummel executed a partial deed of release on August 21, 1984. Ten days later, on August 31, 1984, the state was granted a temporary restraining order against Rogue Creek Valley, Inc. All sales and work was enjoined at the development. Thereafter, Rogue Creek Valley, Inc., filed for Chapter 11 bankruptcy on March 20, 1985, and, in May of 1985, Rummel foreclosed on the deed of trust.

### State's Burden of Proof

 To prove a violation of the Merchandising Practices Act of 1978, the state does not need to prove the elements of common law fraud. *State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633, 635[3] (Mo.App. 1988). The state only needs to prove the defendant's conduct constituted unfair practices. *State ex rel. Webster v. Cornelius*, 729 S.W.2d 60, 64[2] (Mo.App.1987); *State ex rel. Ashcroft v. Marketing Unlimited of America, Inc.*, 613 S.W.2d 440, 445[1] (Mo.App.1981). It is the defendant's

---

**3.** Chapter 42 of the United States Code regulates interstate land sales. 15 U.S.C. § 1701 *et seq.* The purpose of the Interstate Land Sales Full Disclosure Act is "to prohibit and punish fraud in ... land development enterprises ..." *McCown v. Heidler,* 527 F.2d 204, 207[2] (10th Cir.1975). The act provides for exemptions, among which is an exemption for "a developer who is engaged in a sales operation which is intrastate in nature." 15 U.S.C. § 1702(b)(7)(A). To utilize this intrastate exemption, the lot must be "free and clear of all liens, encumbrances, adverse claims," 15 U.S.C. § 1702(b)(7)(A)(i); and the and developer must provide the purchaser with "a clear and specific statement describing a good faith estimate of the year of completion of, and the party responsible for, providing and maintaining the roads, water facilities, sewer facilities and any existing or promised amenities" 15 U.S.C. § 1702(b)(7)(A)(iii)(I).

conduct, not his intent, that constitutes unfair practices. *Id.*

■ The state acknowledges it must accept the determinations of credibility implicitly made by the trial court, view the evidence and permissible inferences most favorably to the judgment and disregard all contrary evidence and inferences. *See, e.g., Snowden v. Gaynor*, 710 S.W.2d 481, 483 (Mo.App.1986). The state, however, does not follow these principles in its attempt to show it met its burden under the Act. Rather, the state disregards the implicit determinations of credibility made by the trial court, culls the 735 pages of transcript and the 100 plus exhibits for the evidence most favorable to it and, from this evidence, makes inferences favorable to it. We have carefully read the transcript and examined the exhibits, and, within the scope of our review, we find the record sufficient to affirm the court's entry of judgment in favor of defendant Eisenbeis.

### Diversion of Funds

The state, by testimony of its investigator and by exhibits, established the deposits made into and checks written on the bank accounts of Rogue Creek Valley, Inc. Each check was signed by one of the three individual defendants and was made out to several different business entities. The investigator, however, admitted she did not know the source of the deposits to the Rogue Creek Valley, Inc. accounts, she did not investigate the bank records of these other business entities, and she did not know for what reason the checks were written. Moreover, defendant McCaleb testified, as far as he knew, none of the entities receiving money failed to reimburse Rogue Creek Valley, Inc., or failed to use the money to pay debts incurred by that corporation.

Quite simply, the trial court did not accept the state's inference that these checks represented improper diversion of funds.

### Representations About Facilities And Utilities

The state contends false representations were made by the salespeople of Rogue Creek Valley, Inc. or by Eisenbeis himself about the actual provisions for and the completion dates of facilities such as horseback riding, miniature golf, archery, roads, lakes, and utilities such as electricity, water and sewers. The state characterizes these false representations as unlawful merchandising practices. The evidence, however, does not show any false representations.

Sixteen persons who purchased lots from Rogue Creek Valley, Inc. testified. They all said the salesperson they dealt with made statements regarding the availability of these facilities, utilities and amenities. They also testified these dates were often in conflict with the completion dates in the Intrastate Exemption Statements and the work was not completed as of June 1984, when the Rogue Creek Valley sales office closed, nor was it completed as of May 1985, when Rummel foreclosed. However, McCaleb testified that it was weather, ground conditions and employee illness which prevented work from being completed on the dates promised.

Viewed most favorably to the state, this evidence shows legitimate factors caused the delays of the stated completion dates. Therefore, it is sensible to infer the sales staff's statements about completion dates were promises made implicitly conditioned on legitimate factors and were not statements of fact known to be false or, even, not known to be true. Thus, no unfair practices occurred. *See State ex rel. Danforth v. Independence Dodge, Inc., supra,* 494 S.W.2d at 368[11].

More important, perhaps, the state fails to show the basis for holding Eisenbeis legally responsible for the statements made by these salespeople. The state could have shown Eisenbeis was responsible for such statements in either of two ways. First, by showing Eisenbeis himself made statements similar to the statements made by the sales staff. Second, by demonstrating a principal and agent relationship between Eisenbeis and the sales staff. The state does not expressly address either one of these principles and, thus, does not marshal the evidence to make the requisite showing

that Eisenbeis must be held personally liable.

First, we consider Eisenbeis' personal conduct. Barbara Trueblood, a secretary employed by Rogue Creek Valley, Inc. did testify that Eisenbeis received all completed sales contracts, that Eisenbeis would be called by Winfield when the sales manager was unsure if "he could let a certain deal go through on a lot," and that Eisenbeis attended sales meetings several times a month where he would give "pep talks." At these meetings, however, Eisenbeis, never gave direct answers about any completion dates. Moreover, when Rummel was asked about Eisenbeis's "participation" in sales promotion dinners for prospective purchasers, he said Eisenbeis "participated in the meetings", but he went on to say, "I don't believe [Eisenbeis] gave any presentations." Rummel also said Eisenbeis talked "to lot buyers that were invited to the meeting." However, not one of the sixteen "consumers" who testified said he or she had any conversations with Eisenbeis. This evidence is simply insufficient to show Eisenbeis personally was unfair in his dealings with the "consumers."

Second, the state has marshaled no evidence to support Eisenbeis's responsibility based upon a principal/agent relationship. We are prevented from picking up the cudgels on the state's behalf and attempting to find Eisenbeis was a principal personally responsible for the statements of the sales staff, as statements of his agents. More important, perhaps, we are precluded from presuming this principal/agent relationship existed. *See, e.g. Dudley v. Dumont,* 526 S.W.2d 839, 843–44[3] (Mo.App.1975). Furthermore, the present record shows the sales staff was employed by Rogue Creek Valley, Inc. To show Eisenbeis was personally responsible for the sales staff's statements, the state, at least, would either have to show Eisenbeis was the corporate officer who must be held responsible for the statements of the corporation's sales staff, or the state would have to pierce the "corporate veil". The state made no attempt to do so. *See, e.g. Terre Du Lac Ass'n. v. Terre Du Lac, Inc.,* 737 S.W.2d 206, 218[28] (Mo.App.1987); *Liberty Fi-*

*nancial Management Corp. v. Beneficial Data Processing Corp.,* 670 S.W.2d 40, 52[13] (Mo.App.1984).

### *Liens on the Lots Sold*

The state also contends the purchasers of some 90 lots were not told there was a lien on the property in the area where they were purchasing. This failure to inform the purchasers of the lien, the state argues, was compounded by the statement in the Intrastate Exemption Statement given to these purchasers that there were "no liens upon the property for sale in Rogue Creek Valley." These statements were all signed by Eisenbeis.

Eisenbeis negotiated and signed the agreement for the purchase of the development by Rogue Creek Valley, Inc. from Oak–Land. The agreement provides for a promissory note from that corporation to Oak–Land secured by a deed of trust on some of the unplatted land. This portion of the development continued to be subject to the deed of trust. The agreement, however, also provides for release of the lien "by substituting as collateral [ ] sales contracts and/or notes and Deeds of Trust on sale of the developed lots...."

As with the statements regarding completion dates, the state again fails to marshal evidence which shows Eisenbeis's personal responsibility for any statement made by a salesperson which led a purchaser to believe no lien or encumbrance existed on his or her lot. Viewed most favorably to Eisenbeis, the evidence simply shows that Eisenbeis himself probably learned of the continuing existence of the lien around June 15, 1985, the date of the letter Rummel's attorney mailed to Eisenbeis informing Eisenbeis of the existence of this lien. This lien was released after Rogue Creek Valley, Inc. filed suit against Rummel to obtain a release as to the lots which were sold.

Certainly an erroneous statement about the existence of these liens can be construed as a misrepresentation. And, it is conduct not intent that must be considered in enforcing the Act. *State ex rel. Ash-*

*croft v. Marketing Unlimited of America, Inc., supra,* 613 S.W.2d at 447. However, there is simply no showing Eisenbeis knew lots in the area subject to the deed of trust were being sold without having the lien released; nor is there any showing of the grounds upon which this knowledge legally can be imputed to Eisenbeis.

### Summary

In summary, within the limits of the scope of our review, the state simply showed us the development and marketing of Rogue Creek Valley was not a model operation. For all the variations between promises and actuality perceived by the state, the state either has not shown any unfair merchandising practices, or, if these practices were shown, the state failed to show Eisenbeis personally engaged in these practices or must be held legally responsible for them. The Act is liberally interpreted but, even with a liberal interpretation, Eisenbeis still must be properly tied to the alleged improper acts. *See e.g. State ex rel. Webster v. Areaco Inv. Co., supra; State ex rel. Webster v. Cornelius, supra; State ex rel. Ashcroft v. Marketing Unlimited of America, Inc., supra.* Understandably, judgment was entered against Rogue Creek Valley, Inc. alone.

### Defendant Higgins' Appeal of the Default Judgment Against Him

After granting the motion for directed verdict filed by defendants Eisenbeis and McCaleb, the court granted the state's motion for a default judgment against defendant Higgins. The court found Higgins had violated the Act as pleaded by the state, enjoined him from engaging in those violations, ordered him to pay the state $300,000 "as restitution and for the benefit of the lot owners" in the development and ordered him to pay $30,000 to the "Merchandising Practices Revolving Fund."

■ In his initial brief, Higgins argues the default judgment against him was not supported by substantial evidence. Higgins is in default because he failed to file an answer to the state's petition within the allowed time. He, therefore, is held to have admitted the allegations in the state's petition. *O'Connor v. Quiktrip Corp.,* 671 S.W.2d 17, 19[1] (Mo.App.1984). Hence, his argument has no merit.

In his reply brief, Higgins, for the first time, raises a procedural due process argument. We are not required to address an issue raised for the first time in a reply brief. *Wilner v. O'Donnell,* 637 S.W.2d 757, 764[11] (Mo.App.1982). We do so, however, *ex gratia.*

■ Higgins was properly served with summons on September 24, 1987. On October 26, 1987, he appeared pro se and was granted a continuance until November 24, 1987 "to file motions and/or pleadings." On November 30, 1987, Higgins filed pro se motions to dismiss the state's petition for failure to state a claim, or, in the alternative, to require the state to make its allegations more definite and certain. These motions were well drafted. Correct legal terminology was used. The motions were denied on December 15, 1987. Higgins' answer was thus due "within ten days after notice of the court's action." Rule 55.25(c).

Higgins, however, contends he was not given notice of the trial court's denial of his motions and, therefore, he argues, "he was under no duty to file a responsive pleading until such time as he had the ten days' notice" of the denial of his motions. Since he had no duty to file a responsive pleading, he reasons, the judgment entered against him for failure to file an answer is invalid because it deprives him of property without due process. Higgins' argument is misdirected and, thus, misses the mark.

As noted, on December 15, 1987, Higgins' pro se motions were denied by the trial court. The record before us does not show Higgins was given formal notice of this denial, but the minute entry reflecting the denial does state: "counsel ask for Higgins to pass motion but did not enter." No further record was ever made before the trial court to explain the correct meaning of this unclear and ambiguous entry. On appeal, counsel for Higgins runs through the various meanings he perceives this entry to have, none of which, he ar-

gues, should bind Higgins with notice of the court's denial of the motions. We need not address these interpretations of the minute entry.

On December 15, 1987, when the denial of the motions was entered, Rule 74.78 required the clerk of the court to serve notice by mail on every party affected by the denial "who [was] not in default for failure to appear and who was not present in court in person or by attorney at the time of the entry" of the order. If this Rule did apply to Higgins, he had the right to have the order "set aside for good cause shown upon written notice filed within 6 months from the entry of the order." Rule 74.78. Higgins, however, did not choose to attempt to set the denial aside. He chose to live with it.

There is no question he made a conscious choice to live with the denial because there is no question he had actual knowledge of the denial within six months of the order denying his motions. On February 18, 1988, within two months of the order, he filed a pro se Notice of Appeal from the default judgment which was based upon the denial of his motions and his failure to file an answer. He not only attached a copy of the trial court's judgment to his Notice of Appeal (See Appendix A), he demonstrated his correct understanding of the judgment by setting out the following required "Brief Description of the Case":

> State sued Appellant [Higgins] and others as alleged developers of a recreational land development for relief under Missouri Merchandising Practices Act. The trial court sustained the motions of certain defendants for "directed verdict" at the close of Plaintiff's case. Judgment was entered against Appellant [Higgins] for injunctive relief, "restitution," and for a deposit to to Revolving Fund and costs.

In addition, one of the issues anticipated by him on appeal, set out in his Statement of Anticipated Issues required by our local Rule A.01, was:

> Whether [his] ... Constitutional rights of due process were violated by the Court's order overruling [his motions] without first having given notice to [him] and [sic] opportunity to be heard.

Simply stated, Higgins chose to forgo his procedural right to test in the trial court the propriety and validity of that court's denial of his motions.

More important, the default judgment against Higgins was entered on January 2, 1988. Rule 74.03, effective January 1, 1988, parallels former Rule 74.78 which it replaces, by requiring the clerk of the court to give written notice of a judgment to "each party who is not in default for failure to appear and who was not present in court in person or by attorney at the time of entry" of the judgment. If this provision applied to Higgins and he did not receive notice of the entry of the default judgment, he had the right to have the judgment "set aside for good cause shown upon written notice filed within six months from the entry" of the judgment. Rule 74.03. Higgins chose not to follow this procedure. He, like the defaulting parties in *Vonsmith v. Vonsmith*, 666 S.W.2d 424 (Mo. banc 1984) and *Barney v. Suggs*, 688 S.W.2d 356 (Mo. banc 1985), never afforded the trial court the opportunity to take corrective action, if such action were needed, even though he has been provided with the procedural vehicle to afford that court this opportunity. Rule 74.03. Without an appropriate record made below, we have no authority to set aside the default judgment, and, had we this authority, we would decline to exercise it given the record now before us.

By definition, a default judgment is entered without the defendant having his day in court. Therefore, the procedural defects upon which the default judgment rest must be examined with care to determine whether the defendant was afforded the process he was due, particularly where, as here, the state obtains a money judgment against one of its citizens for the benefit of a state fund and, as a vicarious avenger, for the benefit of certain specified citizens. We have examined the present record. Higgins was afforded the procedural process he was due.

Judgment affirmed.

SMITH, P.J., and STEPHAN, J., concur.

APPENDIX A

Circuit Court of St. Louis County
~~WASHINGTON~~
TWENTY-FIRST JUDICIAL CIRCUIT
~~FOURTH~~
STATE OF MISSOURI

# NOTICE OF APPEAL TO MISSOURI COURT OF APPEALS

**FILED**

EASTERN DISTRICT

O'clock_____Minutes___ M.

| | |
|---|---|
| STATE OF MISSOURI, ex rel<br>WILLIAM L. WEBSTER, Attorney General | Hon. John C. Brachman, 18 1988<br>Judge<br>Washington County Circuit |
| Plaintiff<br>vs.<br>ROGUE CREEK VALLEY, INC, BRADLEY | Division No.<br>CV1084-154-CC<br>By |
| EISENBEIS, STUART McCALEB, AND<br>JAMES HIGGINS | Circuit Court Cause No. |
| Defendant**s** | 5-4417<br>Appellate No. |

Notice is hereby given that ____Defendant James Higgins____
appeals to the Missouri Court of Appeals, Eastern District.

February 18, 1988
Date Notice of Appeal Filed
(to be filled in by Clerk's Office)

_Signature of Attorney or Appellant_

**FILED**
FEB 22 1988
DEIRDRE O'MEARA AHR
CLERK, MISSOURI COURT OF APPEALS
EASTERN DISTRICT

## CIVIL CASE INFORMATION

James Higgins, Pro Se
Typed Name of Appellant's Attorney
Street **220-A Main Street**
City **Festus** State **MO** Zip Code **63028**
Telephone **(314) 937-3638**

James Higgins
Typed Name of Appellant
Street **220-A Main Street**
City **Festus** State **MO** Zip Code **63028**

Date of Judgment **1-11-88**

☒ Court Number of Days of Trial ____ 4
☐ Jury

Brief Description of Case:

Peter Lumaghi, Asst. Deputy Attorney General
Typed Name of Respondent's Attorney
Street **111 No. 7th, Wainwright Bldg.**
City **St. Louis** State **MO** Zip Code **63101**
Telephone **(314) 444-6816**

Ronald Harrison
Typed Name of Court Reporter
**(314) 583-3786**
Telephone Number of Court Reporter

Date/After Trial Motion Filed _____
Date/After Trial Motion Decided _____
Judgment or Order Appealed From: _____
(Attach a copy of Judgment)

State sued Appellant and others as alleged developers of a recreational land
development for relief under the Missouri Merchandising Practices Act. The
trial court sustained the motions of certain defendants for "directed verdict"
at the close of Plaintiff's case. Judgment was entered against Appellant for
injunctive relief, "restitution," and for a deposit to Revolving Fund and
costs.

### DIRECTION TO CLERK

The clerk is required to mail a copy of the notice of appeal by certified mail to the attorneys of record of all parties
other than those taking the appeal, and to mail a copy of the notice of appeal together with the docket fee to the clerk
of the appellate court. If a party does not have an attorney, the notice must be mailed to the party at his last known
address. The clerk should then fill in the memorandum on the reverse side hereof. (See Rules 81.08 and 30.01 (h) & (i) ).