497 P.2d 516

The STATE of Arizona, Appellee,

v.

Richard Lee MILLER, Appellant.

No. 2194.

Supreme Court of Arizona,
In Banc.

May 30, 1972.

Rehearing Denied June 27, 1972.

**304**

Gary K. Nelson, Atty. Gen., by John Ryley and Albert M. Coury, Asst. Attys. Gen., Phoenix, Roslyn Moore, Third Year Law Student, Arizona State University, of counsel, Tempe, for appellee.

Lewis & Roca, by Paul G. Ulrich and James P. Walsh, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from jury verdicts and judgments of guilty, with a prior conviction (§ 13–1650 A.R.S.), to first degree burglary, §§ 13–301 and 13–302 A.R.S., 13–138 to 13–140 A.R.S. and grand theft, §§ 13–661, 13–663, 13–138 to 13–140 A.R.S., and concurrent sentences cf 10 to 12 years.

We are asked to answer the following questions:

1. Should evidence obtained incident to defendant's arrest have been suppressed?
2. Was the evidence sufficient to establish burglary?
3. Was the evidence sufficient to establish grand theft?
4. Was the disposition of the codefendant's case properly excluded from evidence?
5. Was there error in the State's reference to the defendant's not testifying?
6. Should the prior conviction have been used for sentencing purposes?

The facts necessary for a determination of this matter on appeal are as follows. At about 9:50 p. m. on the night of 30 December 1969 two individuals were driving past 329 East Indian School Road when they spotted two people they believed to be breaking into the Friden Office Machine building located at that address. The driver, Don Herring, turned his car around and drove back to an accident scene he had previously passed and told a Police Officer, Raymond Tyres, that he had observed two men at Fourth and Indian School and "one man was pushing another man in an open window."

Officer Tyres sped to the area and observed two men (the defendant Richard Lee Miller and his codefendant Leonard James Lackey) standing behind a tree against the east side of the Friden Building. The window under which they had been standing was "ripped open" and the screen was torn off. Officer Tyres completed his radio call for back-up help for a possible burglary, and got out of his car. The defendants, upon seeing the Officer, began walking hurriedly southward, but stopped and complied with Officer Tyres when he asked them to back up against the wall. They did not respond, however, when asked what they were doing. When asked for identification, Lackey produced some identification but Miller said he didn't have any.

At this point two other officers, both of whom had heard the radio call for help in a possible burglary, arrived almost contemporaneously on the scene. They were informed by Officer Tyres that the two men up against the wall were the burglary suspects. Officer Tyres, after checking Lackey's identification—Miller was still unable to produce any identification—advised the defendants that they were under arrest for vagrancy. Then the officers searched the defendants and found a rachet and penknife on Miller's body and a pair of leather gloves on the ground next to him. A pair of gloves and a flashlight were discovered on Lackey. The defendants were placed in police cars and one of the officers told them either that they were presently under arrest for burglary or were to be arrested for burglary (his testimony is unclear).

A check of the building revealed that "there were pry marks * * * on the window." The officers boosted themselves through the open window (it was six feet off the ground) and searched the building. They "observed one or two places where we thought maybe an office machine might have been but wasn't." They found a rear door which opened up to a pickup truck backed flat against it and three business machines in the flat rear of the pickup. A check of the registration of the truck revealed it was in the name of the codefendant Lackey. The torn screen was found behind the building. The officers then arrested (or re-arrested) the defendants for burglary and accompanied them down to the police station.

The defendants were charged with first degree burglary and grand theft. At the preliminary hearing on 21 January 1970 the codefendant Lackey pled guilty to the reduced charge of petty theft and, after a speech by his counsel emphasizing his relatively spotless former record and his willingness to confess to the police the day after the crime, received a 90 day suspended sentence. Miller was bound over on both counts.

The defendant made a timely motion to suppress the evidence obtained as a result of the vagrancy arrest, on the theory that no probable cause existed to arrest for vagrancy. The motion was denied. At his trial, which began on 27 April 1970, Miller concentrated on an alibi defense and an alternate defense that the machine was worth less than $100, and therefore the theft was not grand theft.

Defendant was convicted, and pursuant to the recidivist statute, § 13–1650 A.R.S., the State put into evidence a prior (1960) California conviction which resulted from a guilty plea by Miller. Defendant made timely objections to the admission of the prior conviction, the court denied the motions, and the jury found the defendant guilty with a previous conviction. The defendant was sentenced to 10 to 12 years on each count, to be served concurrently, and the appeal followed.

## SHOULD EVIDENCE OBTAINED INCIDENT TO DEFENDANT'S ARREST HAVE BEEN SUPPRESSED?

At the trial, the defendant unsuccessfully moved to suppress the evidence obtained after the arrest on the basis that there was no probable cause to arrest for vagrancy. On appeal the defendant further raises the question of the constitutionality of the Arizona vagrancy statute. The recent United States Supreme Court cases of Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 and Smith v. Florida, 405 U.S. 172, 92 S.Ct. 848, 31 L.Ed.2d 122, both decided on 24 February 1972, have cast doubt on the constitutionality of vagrancy statutes such as Arizona's. It is not, however, necessary to answer the question of the propriety of the arrest for vagrancy or the constitutionality of the vagrancy statute, because we believe that at the time of the arrest for vagrancy, there was probable cause to arrest for burglary and therefore the arrest was initially lawful.

The authorities are admittedly in disagreement on this point, but we feel that the better view is that when an officer makes an initial arrest for a minor offense

such as vagrancy, which charge is considerably less serious than the offense which is actually and logically under consideration and investigation, the arrest and the resulting search is lawful provided there is at that time probable cause to make the arrest for the more serious offense and the arrest for the lesser offense is not merely a sham or subterfuge for the purpose of obtaining sufficient evidence to have probable cause to arrest for the more serious offense. Of course, if probable cause for the more serious offense is initially lacking, then the arrest must rise or fall on the sufficiency and constitutionality of the arrest for the lesser offense. Where the arrest is a mere sham, the courts have stated:

"A study of the facts of appellant's arrest for vagrancy and the events prior thereto convinces us that the arrest was merely a sham for the officers' real purpose which was to gather evidence in their investigation of the robbery. No evidence whatever appears in the record which would even hint at there being any probable cause for this arrest and the state so concedes in its brief. Appellant testified that when he was told he was being arrested for vagrancy, he then informed Officer Ayars that he was employed, he had a home, and had money with him at the time and this was corroborated by the officer. Furthermore, the search in the police station revealed that each suspect indeed did have a substantial amount of cash with him, yet they were booked on the vagrancy charge. * * * Activity such as this by the police is entirely inimical to basic constitutional standards for arrest and search and simply cannot be countenanced." State v. Barwick, 94 Idaho 139, 141, 483 P.2d 670, 672–673 (1971). See also Brumley v. State (Okl. Cr.), 484 P.2d 554 (1971).

However, where there is probable cause to arrest for the more serious crime and the arrest for vagrancy is not a mere sham or subterfuge:

"* * * The officers' correct choice of a legal theory to rely on at the time of the arrest is not the factor which provides protection to persons from unreasonable searches and seizures. The barrier to an intrusion on a person's constitutionally guaranteed 'zone of privacy' by way of an arrest for a crime is removed only when the police officers are aware of specific, articulable facts amounting to 'probable cause'. State v. Smithers, supra. Where the police awareness of such facts is not present, then their choice of a legal theory is irrelevant because the arrest is invalid in any case. Where the police awareness of such facts is present, society's need to have the person arrested outweighs whatever minimal value the person arrested receives from having the arresting officers choose the correct legal theory for the arrest. The issue is, did the officers, at the time they stopped the car, have knowledge of facts and circumstances sufficient to warrant a prudent man of reasonable caution in believing that the drvier (sic) of the car had committed a burglary and assault. We hold that they did have such knowledge." Smith v. State (Ind.), 271 N.E.2d 133, 137 (1971).

And:

"We have also been mindful of the fact that the police officer acts within the context of everyday occurrences and is not presumed to be a legal technician. * * *" People v. Battiste (Ill.App.), 272 N.E.2d 808, 811 (1971). See also State v. Daugherty, 94 Idaho 232, 486 P.2d 243 (1971).

■ We have reviewed the evidence in the instant case and we feel that pursuant to our statute, § 13–1403 A.R.S. and the Arizona cases, State v. Pederson, 102 Ariz. 60, 424 P.2d 810 (1967); State v. Vaughn, 104 Ariz. 240, 450 P.2d 698 (1969); State v. Williams, 104 Ariz. 319, 452 P.2d 112 (1969); and State v. Dessureault, 104 Ariz. 380, 453 P.2d 951, reh. den. 104 Ariz. 439, 454 P.2d 981 (1969), cert. den. 397 U.S. 965,

90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), there was sufficient evidence to "warrant a man of reasonable caution" to believe that an offense had been committed and that the defendants committed it. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Indeed, in the instant case, the officer would have been subject to valid criticism had he not made an attempt to detain the two suspects after they had failed to adequately respond to his legitimate questions concerning their presence and identity. The facts surrounding the case clearly indicate that there was probable cause to arrest for burglary. It is therefore immaterial that the initial arrest was for vagrancy.

## WAS THE EVIDENCE SUFFICIENT TO ESTABLISH BURGLARY?

█ Defendant contends that the evidence was insufficient to support the burglary conviction in that neither entry nor intent was shown: § 13–301 and § 13–302 A.R.S.

Defendant concedes that there was entry into the building, but contends that only Lackey had entered by the time Officer Tyres arrived. Defendant further contends that, assuming an entry, the intent to commit theft (at the time of the entrance) was not proven by sufficient evidence.

The jury had before it defendant's presence at the scene of the burglary, defendant's gloves, the stolen business machine, the forcible entry and the fact that it most likely took the combined efforts of two men to accomplish the fairly difficult physical acts involved. We believe the evidence supports the verdict of the jury. State v. Miller, 104 Ariz. 335, 452 P.2d 509 (1969); State v. Rood, 11 Ariz.App. 102, 104, 462 P.2d 399, 401 (1969).

## WAS THE EVIDENCE SUFFICIENT TO ESTABLISH GRAND THEFT?

§ 13–663 A.R.S. provides in pertinent part:

"§ 13–663. Degrees of theft

"A. 'Grand theft' is:

"1. Theft of money, labor or property of the value of more than one hundred dollars."

As indicated, supra, the service manager of Fridens was called to testify as to the value of the machine stolen from his building. Defendant objected to the service manager's testimony as hearsay and further objected that the court committed error when it instructed on the market value of the machine, rather than the cost of the machine to the company.

The direct examination of the service manager proceeded as follows:

"Q * * * do you have an opinion as to the value of this machine of which we are talking, the Smith-Corona Marchant calculator that you observed on the 30th of December, that had been removed from your building at this time?

"A Yes.

"Q What would that approximate value be?

"A It would be approximately a hundred and fifty to a hundred and seventy-five dollars, 'cause any calculator that works is worth at least a hundred and twenty-five dollars."

█ Defendant contends that the service manager's opinion is hearsay in that he only knew what people in his business said was the worth of the machines he was in charge of servicing. Admittedly, there can be no perfect, non-hearsay witness as to the value of a resale item that doesn't have an official, unchangeable price:

"Knowledge of value does not necessarily rest on hearsay. It might be supposed that to know value is merely to know what other people *say* the thing is worth,—merely to have heard them offering and accepting prices. But the answer is that these various instances of offers or acceptances of prices, averaged into a mean or probable figure, are what constitute value. The statements of persons declaring their estimates of the prices they would give or receive are not taken,

on the credit of those persons, as trustworthy assertions of the fact of value, but merely as items of conduct which *in themselves make up* that total fact of conduct which we call value. Thus, if A sits in a merchant's office and listens to the terms accepted and rejected for a dozen articles, he acquires a first-hand knowledge of value; but if he goes in and asks the merchant to tell him the value of a given article, his knowledge is based on a belief in the truth of the merchant's assertion. In the former case, his knowledge is not based on hearsay. * * *" Wigmore On Evidence, § 719, 3rd Ed. (1940).

The witness had spent seventeen years with these business calculating machines in various capacities from technician to service manager and had been working intimately with sellers and buyers of the machines for the whole period. The court was correct in concluding he was an expert in the business at hand and that his testimony concerning the value of the stolen machine was admissible.

■ The trial court was also correct in its instruction on value:

"Value, as that term is used in statutes relating to grand and petty theft, is the reasonable fair market value of the property at the time of the taking."

This instruction is entirely consistent with the definition of value in Underhill's Criminal Evidence, Vol. 3, § 603, 5th Ed.: "The criterion of value is the market value of the stolen property at the time and place of the theft." It is also consistent with the previous cases on this subject by this court —Murphy v. State, 50 Ariz. 481, 73 P.2d 110 (1937) and State v. Jones, 104 Ariz. 14, 448 P.2d 70 (1968). The instruction does not forbid the jury to consider the defendant's evidence that Friden originally acquired the machine for less than $100, but allows the jury to use all the evidence presented to determine the market value of the machine at the time and place of the theft.

## WAS THE DISPOSITION OF THE CO-DEFENDANT'S CASE PROPERLY EXCLUDED FROM THE EVIDENCE?

■ At the trial, defendant sought to introduce portions of the preliminary hearing which showed the dismissal of the felony charges against the codefendant Lackey. The defendant's theory here—which was rejected by the court—was that showing that the State eventually dismissed the burglary charge against Lackey and only convicted him of petty theft might have caused the jury to acquit Miller on the burglary charge and reduce the grand theft to petty theft. Lackey did not testify and we are not concerned with the use of this evidence for legitimate cross-examination purposes.

We agree with the State that the "disposition made at a plea bargain of a co-defendant is irrelevant in the determination of the guilt or innocence of the defendant." There are good policy reasons for this. The guilty plea bargain as a procedure to speed up the judicial process, improve judicial economy, and provide an incentive for those tempted to aid the State in its search for justice, is an increasingly valuable tool in the enforcement of justice. To allow evidence of the result of a plea bargaining session (a result which is, unfortunately, not always consistent with what actually happened in the crime) would have an unnecessarily adverse effect on the use of plea bargaining. We hold that the trial court was correct in denying the admission of evidence of Lackey's plea bargain.

## WAS THERE ERROR IN THE STATE'S REFERENCE TO DEFENDANT'S NOT TESTIFYING?

■ In its closing statement the State argued as follows:

"Now, I don't know exactly what happened that night, nobody knows exactly what happened except for Mr. Lackey and Mr. Miller; but I would suggest to you this. We know one thing. The window was approximately six feet off the

ground. I doubt whether one man could get up, open that window, and get in by himself * * *."

Defendant urges that this summation violates his Fifth Amendment right not to take the stand and his concomitant right not to have his decision to refuse to take the stand commented upon. See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). And see State v. Smith, 101 Ariz. 407, 420 P.2d 278 (1966) and State v. Acosta, 101 Ariz. 127, 416 P.2d 560 (1966). The right is also protected by § 13–163 A.R.S. which prohibits the prosecution from using against the defendant his refusal to take the stand.

In Acosta, supra, at 101 Ariz. 129, 416 P.2d 562, it was stated that a comment is improper only if it is "calculated or intended to direct the attention of the jury to the defendant's neglect to avail himself of his right * * *." We do not believe this to be the case herein and hold that the comments were not erroneous. Counsel should be aware, however, that this court has been very strict in enforcing the "no comment rule" on defendant's refusal to take the stand and that care should be taken to avoid crossing over the line into reversible error in arguments to the jury.

## SHOULD THE PRIOR CONVICTION HAVE BEEN USED FOR SENTENCING PURPOSES?

The defendant contends that inasmuch as the record of his 1960 conviction in California does not show that he was represented by counsel at the time of the judgment, it cannot be introduced under the authority of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) and Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967). Defendant contends:

"Appellant objected to the court's considering the 1960 California conviction because the record of the California conviction on its face only indicated that appellant was represented by counsel when sentenced. Appellant had entered a plea of guilty to the prior offense in Cali-

fornia. The document is silent as to whether appellant was represented by counsel at the time of entering the plea * * *."

It is true, of course, that you cannot use a prior conviction which is constitutionally infirm to enhance the punishment in a second trial. Burgett v. Texas, supra. That is not the case herein. The record indicates, on its face, that at the time of sentencing the defendant was represented by counsel. Nowhere in the allegations of the defendant, by affidavit or otherwise, is there any indication that he was not also represented at the time he was convicted. This case can be distinguished from the two recent United States Supreme Court cases of Loper v. Beto, 404 U.S. 954, 92 S.Ct. 1014, 31 L.Ed.2d 374, 22 March 1972 and United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592, 11 January 1972. In those cases it was determined that the previous convictions were constitutionally infirm. Although defendant may at times benefit from a silent record, we do not believe it unreasonable, illogical or even contrary to recent United States Supreme Court cases on this subject to require some allegation of infirmity by the defendant when he is attempting to go behind the face of a judgment of a sister state and is requesting us to ignore the judgment despite the "full faith and credit" clause of the United States Constitution. There is no such allegation here and the record that we do have leads us to believe that in fact he did have counsel at all stages of the proceedings. We feel, therefore, that the motion to suppress the prior conviction was properly denied.

Judgment affirmed.

HAYS, C. J., HOLOHAN, J., WILLIBY E. CASE, Jr., Court of Appeals Judge, Division 1, Department A, and WILLIAM E. EUBANK, Court of Appeals Judge, Division 1, Department B, concur.

STRUCKMEYER and LOCKWOOD, JJ., did not participate in the determination of this matter.