**STATE of Missouri, Respondent,**

v.

**Thomas Donald MORIN, Appellant.**

No. 18747.

Missouri Court of Appeals,
Southern District,
Division Two.

March 30, 1994.

Motion for Rehearing or Transfer
Denied April 26, 1994.

Rosalynn Koch, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant, Thomas Donald Morin, a prior offender, § 558.016.2, RSMo Cum.Supp.1990, and persistent offender, § 558.016.3, RSMo Cum.Supp.1990, was tried by jury on five counts of unlawful merchandising practices, § 407.020, RSMo Cum.Supp.1992.[1] The jury

---

1. At the time Appellant was tried, the version of § 407.020 in RSMo Cum.Supp.1992, was in force. It was enacted as C.C.S.S.B. 705, Laws of Missouri 1992, pp. 1094–1105, and took effect August 28, 1992. As appears more fully *infra*, the conduct of Appellant on which this case is

found Appellant guilty of Counts I, II and V. The jury deadlocked on Counts III and IV, and the trial court declared a mistrial on those counts.

Thereafter, the trial court imposed consecutive seven-year prison sentences on Appellant for Counts I, II and V. The prosecutor "dismissed" Counts III and IV.

Appellant brings this appeal. The second of his five points relied on, which we address first, maintains the evidence was insufficient to support a guilty verdict on any count.

In deciding whether the evidence was sufficient to support the guilty verdicts, we consider the evidence and all inferences reasonably drawn therefrom in a light most favorable to those verdicts, disregarding all contrary evidence and inferences. *State v. Davis*, 814 S.W.2d 593, 594[1] (Mo. banc 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). Our review is limited to determining whether the evidence was sufficient to persuade any reasonable juror as to each of the elements of the crime, beyond a reasonable doubt. *State v. O'Brien*, 857 S.W.2d 212, 215[4] (Mo. banc 1993).

So viewed, the evidence established that Ray Willard, a resident of Springfield, went to work for Appellant as a "courier" in mid-August, 1992. At that time, Appellant was staying at the Ozark Motel on North Glenstone Avenue in Springfield.

Willard had met Appellant on an earlier occasion in St. Louis. When he first met Appellant, Willard knew Appellant as "Mike Delaney." Later, Willard knew Appellant as "Tom Morin."

Describing what he did as a courier for Appellant, Willard testified:

"[Appellant] would give me names and addresses . . . of different locations, and I'd go to that place of business and pick up a check . . . and take it back and give it to him.

. . . .

[Appellant] would give me a receipt to give to them when I'd pick up the check, to leave a receipt with them."

Asked what he earned, Willard answered:

"I was paid ten percent of . . . the amount I picked up. If it was above $50.00, $5.00 was top, and ten percent if it was below $50.00.

Q. . . . And who paid you?

A. Mr. Morin.

Q. Did anybody else pay you?

A. No, sir."

Willard never saw anyone with Appellant. Willard kept a ledger in which he recorded each place he went, the amount he collected, the check number, and the date. At trial, Willard identified Exhibit 1 as the ledger.

Evidence supportive of the verdict on Count I established that Tom Martin and his father bought Minuteman Press in Springfield from Bob Caudell in June, 1992. On August 26, 1992, Martin received a phone call from a man asking for Caudell. Martin informed the caller that Caudell was no longer there. The caller then asked for the new owner, and Martin identified himself as he. The caller said he was Sergeant Mike Delaney with the Highway Patrol and "was taking ads for the Police Times." The caller explained that the money would go to families of officers killed in line of duty. The caller said Caudell had advertised in Police Times in prior years, and asked Martin to do so. Martin replied he would discuss it with his father.

The caller phoned again the next day (August 27, 1992), again identifying himself as Mike Delaney. Martin agreed to a $35 ad.

Later that day, Appellant sent Willard to Minuteman Press. Martin gave Willard a $35 check payable to Police Times. At trial, Willard and Martin identified Exhibit 3 as the check. Willard gave Martin a receipt he (Willard) had picked up from Appellant at the Ozark Motel. At trial, Willard and Martin identified Exhibit 4 as the receipt. Wil-

based occurred during the period from August 26, 1992, to September 2, 1992. On August 26, 1992, the version of § 407.020 in RSMo 1986 was in force. The 1992 version, which took effect two days later, differs in one minor respect from the 1986 version. The difference is immaterial here.

lard delivered the check to Appellant at the Ozark Motel.

Evidence supportive of the verdict on Count II established that on August 27 or 28, 1992, Steve Ansley, owner of Media Art Screen Printing in Springfield, received a phone call from a man who identified himself as a member of Troop D of the Highway Patrol. The caller asked whether Ansley was interested in advertising in Police Times, and said part of the money from Ansley would be contributed to widows of state troopers killed in line of duty.

Ansley told the caller he had two friends in Troop D, Jack Merritt and John Prine. The caller said, "Oh, yeah, I know those guys." Ansley agreed to "donate" $40.

Appellant sent Willard to Media Art Screen Printing. Ansley's wife gave Willard a $40 check payable to Police Times. At trial, Willard and Ansley identified Exhibit 5 as the check. Willard gave Ansley's wife a receipt he had picked up from Appellant at the Ozark Motel. At trial, Willard and Ansley identified Exhibit 6 as the receipt. Willard delivered the check to Appellant at the Ozark Motel.

Evidence supportive of the verdict on Count V established that on August 26 or 27, 1992, Bert Terrell, owner of Insurance Marketing Group, Incorporated, in Springfield, received a phone call from a man who said, "This is the Springfield Police Department." The caller identified himself as a police officer, stated he was phoning on behalf of Springfield police officers, and asked for a donation for families of officers killed in line of duty and for crippled children. The caller added that Terrell would receive a free advertisement in a national police magazine. Terrell agreed to give $50. The caller said the check should be payable to Police Times.

On August 31, 1992, Terrell's comptroller prepared a check payable to Police Times. At Appellant's direction, Willard went to Terrell's office and picked up the check from the comptroller. At trial, Willard and Terrell identified Exhibit 10 as the check. Willard gave the comptroller a receipt he had picked up from Appellant at the Ozark Motel. At trial, Willard and Terrell identified Exhibit 11 as the receipt. Willard delivered the check to Appellant at the Ozark Motel.

On September 2, 1992, Willard went to the office of Leland Bussell, a Springfield lawyer, to pick up a check and leave a receipt. Appellant accompanied Willard, but remained in Willard's automobile when Willard entered the building.

Sergeant Jack Merritt of the Missouri State Highway Patrol also went to Bussell's office that date. Merritt's purpose was "to meet someone that was supposed to be picking up the check and delivering a receipt." Merritt confronted Willard, identified himself, and explained why he was there. Willard told Merritt that Tom Morin was in his (Willard's) automobile. Merritt asked Willard if he knew Morin by "Mike Delaney." Willard replied, "Yes, it's the same person."

Merritt accompanied Willard to the latter's automobile in the parking lot. Merritt found Appellant in Willard's automobile. Merritt took Appellant into custody and advised him of his "Miranda" rights.[2]

Merritt then took Appellant to Troop D headquarters in Merritt's automobile. At Merritt's direction, Willard followed in his automobile.

At headquarters, Merritt interviewed Willard, asking if he knew how many places he had made collections. Willard turned over his ledger to Merritt. As Willard was departing, he told Merritt that Appellant's briefcase was in his automobile. According to Merritt, Willard "wanted to give it to me."

Merritt and Willard went to the parking lot, where Willard handed Merritt the briefcase. At trial, Willard and Merritt identified Exhibit 2 as the briefcase.

Merritt then interviewed Appellant. At the outset, Merritt read Appellant his Miranda rights. Appellant admitted he had solicited funds. Merritt asked Appellant if he had represented himself as a member of a

---

**2.** Presumably, the ritual required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

police agency while doing so. Merritt testified:

> "[Appellant] advised me that in his solicitations of these funds, when he called the people he did not tell them he was a policeman, that he represented the Police Times Magazine."

Appellant opened his briefcase, removed checks payable to Police Times, and gave them to Merritt. Included in the checks were Exhibit 3 (the Minuteman Press check), Exhibit 5 (the Media Art check), and Exhibit 10 (the Insurance Marketing Group check). Merritt found entries regarding those checks in Willard's ledger (Exhibit 1).

Appellant also removed some receipts from his briefcase and handed them to Merritt. According to Merritt, the receipts "appeared to be copies of an original receipt." Merritt continued:

> "[T]here is one of these [receipts] that is obviously altered in that there's white out been used on it and an address has been typed in, and you can see that it's over the white out. This would have been the one that would have been used for a standard to make the copy of these, of the rest of them."

Appellant told Merritt he was under contract to Police Times and gave Merritt two names to call to verify this. One was Bryan DeRue. Merritt testified:

> "[Appellant] stated that he was going to use these receipts until the time that he received documentation from Bryan DeRue, and then he would transfer these over to Mr. DeRue's receipts and submit them to him at that time."

Appellant told Merritt there were items in his motel room that he wanted Merritt to bring him at the jail.

When the interview ended, Merritt took Appellant to the Greene County Jail.

The next day (September 3, 1992), Merritt went to the jail and advised Appellant that in order for Merritt to obtain what Appellant wanted from the motel room, Merritt needed Appellant's consent to search it. Merritt presented Appellant a written "consent to search and a release for the disposition of the property." Appellant signed it in the presence of Merritt and the jail director.

A few days later, Merritt went to the Ozark Motel and took possession of sundry items including a written contract between Appellant and "Mail Box Service" for mail box number 397 at 1926 South Glenstone. Merritt also found a Police Times receipt bearing number 73452, the number on Exhibit 4 (the Minuteman Press receipt), Exhibit 6 (the Media Art receipt), and Exhibit 11 (the Insurance Marketing Group receipt). Merritt concluded the latter three receipts had been photocopied from the one at the motel.

Kenneth Sears, Executive Director of the Missouri State Troopers Association, testified the Association has solicitation programs, but no other group or organization is authorized to solicit funds on behalf of troopers at Troop D. The Association publishes a magazine, Missouri Trooper. It is not associated with Police Times. Appellant had no authority from the Association to solicit money for it. The Association never had a contract with Bryan DeRue or Police Times to solicit money for the Association or on behalf of troopers at Troop D.

Sergeant George Larby of the Springfield Police Department testified he was president of the Springfield Police Officers Association in August and September, 1992. Fund raisers for the Association are not authorized to represent themselves as Springfield police officers, and no officers personally engage in fund raising. The Association never authorized Police Times or any individual named Thomas Morin to solicit funds. The Association does not contribute to widows and orphans of police officers killed in line of duty.

Bryan DeRue, employed by United Publishing Services of Chicago, Illinois, testified it had an agreement with Police Times to solicit advertising for it. Police Times is the official publication of the American Federation of Police.

DeRue testified Appellant phoned him on August 21 or 22, 1992, about becoming a paid telemarketer on behalf of the American Federation of Police and Police Times. DeRue told Appellant he would send him a "media kit" and an advertising contract.

Appellant told DeRue he had taken a receipt from a prior employer and "altered [it] by whiting [it] out and [making] Xerox copies of [it] to use to do business." DeRue told Appellant to cease using altered invoices because he had to have the entire package from DeRue for soliciting customers.

DeRue was shown Exhibit 4 (the Minuteman Press receipt), Exhibit 6 (the Media Art receipt), and Exhibit 11 (the Insurance Marketing Group receipt). He observed they bore the same number, which was forbidden by his company. Furthermore, contrary to a directive of the American Federation of Police, DeRue's return address and toll free phone number did not appear on them. Instead, they carried this address: "1926 South Glenstone, Number 397, Springfield, Missouri 65804." That is not an authorized address for DeRue's company. DeRue continued, "[T]here was no contract to initiate these sales and it's on a fraudulent invoice, so there's no way they could be used in our sales ... [o]r to promote the Police Times."

DeRue also testified there is a standard presentation that must be followed by all telemarketers soliciting on behalf of Police Times. Telemarketers are not allowed to hold themselves out as a police officer or trooper, and are not allowed to say they are collecting money for crippled children or widows and orphans.

DeRue quoted Appellant as saying he was "starting a small operation ... maybe one or two phones." Appellant told DeRue he was "living in a transient ... motel of some sort."

■ Appellant's second point maintains the evidence was insufficient in that it failed to establish beyond a reasonable doubt that he (1) made any representations to any of the alleged victims, (2) made material misstatements of fact, or (3) acted with intent to defraud. We shall discuss these three contentions *seriatim*.

As to contention 1, Appellant reminds us that no victim confronted the caller in person and no victim identified him as the caller. Furthermore, Merritt conceded Appellant never stated he had called Tom Martin, Steve Ansley or Bert Terrell.

Appellant cites *State v. Bunton*, 453 S.W.2d 949 (Mo.1970), an arson case with no factual similarity to the instant case. *Bunton's* only arguable relevance is its statement that "[m]ere suspicion, however strong, will not supply the place of evidence when life or liberty is at stake." *Id.* at 953.

Appellant also cites *State ex rel. Webster v. Eisenbeis*, 775 S.W.2d 276 (Mo.App.E.D. 1989), an action involving alleged violations of the Merchandising Practices Act, chapter 407, RSMo 1978. The trial court found in favor of a corporation's president and sole shareholder (Eisenbeis), and the State appealed. The Eastern District of this Court affirmed, emphasizing no witness testified he or she had any conversations with Eisenbeis. 775 S.W.2d at 280. The Eastern District further held the evidence was insufficient to show Eisenbeis was legally responsible for the allegedly improper acts of the corporation's sales staff. *Id.* at 281.

Appellant insists that inasmuch as the evidence in *Eisenbeis*, a civil case, was insufficient, the evidence in the instant case, a criminal prosecution, must be held insufficient. We disagree. The highly incriminatory evidence against Appellant stands in stark contrast to the deficient evidence in *Eisenbeis*.

Here, the caller identified himself to Tom Martin as Mike Delaney, a name Appellant was using at that time. Martin, Ansley and Terrell each testified the caller was a man.

Willard testified he never saw anyone with Appellant, that he (Willard) was told where to make the collections by Appellant, that he (Willard) was given receipts by Appellant at the Ozark Motel to deliver to the victims, and that he (Willard) delivered all the checks to Appellant at the Ozark Motel. There was no evidence that anyone besides Appellant occupied the room at the Ozark Motel. Willard received his pay from Appellant.

Furthermore, Appellant admitted to DeRue that he (Appellant) had altered the receipts by placing on them the number of the mail box he had rented. Appellant also told DeRue he (Appellant) was starting a small operation, one or two phones.

Finally, when Appellant removed the checks from his briefcase—including the ones from Martin, Ansley and Terrell (Exhibits 3, 5 and 10, respectively)—and handed them to Merritt, Appellant stated that when he "called the people" soliciting funds, he did not tell them he was a policeman. Appellant said nothing from which it could be inferred that anyone except him made any of the calls.

We hold the evidence was sufficient to support a finding, beyond a reasonable doubt, that Appellant was the person who made the calls to Martin, Ansley and Terrell.

■ As to contention 2 in Appellant's second point, he argues the evidence failed to show that the statements made to Martin, Ansley and Terrell were false. Specifically, says Appellant, the thrust of the statements was that money generated from sale of advertisements would be used to benefit families of officers slain in line of duty. Appellant refers us to Defendant's Exhibit F, a copy of Police Times, which contains an article about the "Police Times/American Police Hall of Fame Scholarship Fund Program" for children of officers killed in line of duty. According to Appellant, this shows it was "entirely possible" that the money collected for advertising in Police Times would benefit families of Missouri officers slain in line of duty.

Appellant ignores Martin's testimony that the caller said he was with the Highway Patrol and was taking ads for the Police Times, Ansley's testimony that the caller identified himself as a member of Troop D of the Highway Patrol and said he was soliciting ads for the Police Times, and Terrell's testimony that the caller identified himself as a police officer and said he was phoning on behalf of Springfield police officers.

The testimony of Kenneth Sears, George Larby and Bryan DeRue established that all of the representations in the preceding paragraph were false. Additionally, DeRue testified the receipts used by Appellant were fraudulent in that they displayed the address

of Appellant's rented mail box which was not an authorized address for Police Times receipts.

Furthermore, the article about the scholarship program in Police Times does not state that advertising proceeds go to families of officers killed in line of duty or to crippled children. The article explains that the scholarship fund consists of money from members and donors of the American Police Hall of Fame, matched dollar for dollar by the publishers of Police Times. The stated price on Police Times is $2.50 per copy. If some of the proceeds from advertising in Police Times ultimately find their way into the scholarship fund, it is obviously an indirect process. Additionally, nothing in the article indicates any money from the scholarship fund goes to widows or crippled children. According to the article, funds are made available to assist in tuition, housing and other college or trade-school related costs for children of officers slain in line of duty.

Appellant's contention that the evidence failed to show statements made by the caller to Martin, Ansley and Terrell were false is without merit.

Contention 3 in Appellant's second point is that the evidence failed to show he acted with intent to defraud.

■ Under § 407.020, the use by any person of any misrepresentation in connection with the sale of any merchandise [3] in trade or commerce or the solicitation of any funds for any charitable purpose is an unlawful practice, and any person who willfully and knowingly engages in any such practice with intent to defraud is guilty of a class D felony. *State v. Shaw,* 847 S.W.2d 768, 776 (Mo.banc 1993). An accused cannot be found guilty unless the fact finder determines that he willfully and knowingly engaged in an unlawful practice and did so with the specific intent to defraud his victim by means of the unlawful practice. *Id.* at 776[9].

■ As we understand Appellant's argument, his premise is that inasmuch as he had not converted the checks to his personal use

**3.** The term "merchandise" in § 407.020 means, among other things, any intangibles or services.

§ 407.010(4), RSMo 1986.

at the time Merritt arrested him, the evidence failed to show an intent to defraud.

We reject that theory. As we have seen, the evidence was sufficient to establish that Appellant made fraudulent representations to Martin, Ansley and Terrell. An intent to defraud manifests a purpose or design to deprive someone of property by fraudulent means. *State v. Harris,* 313 S.W.2d 664, 670[5] (Mo.1958). The jury could have reasonably found Appellant knew the representations were false and made them with intent to induce Martin, Ansley and Terrell to write their checks. Appellant achieved his goal.

We hold the evidence was sufficient to support a finding, beyond a reasonable doubt, that Appellant acted with intent to defraud. Appellant's second point is denied.

We next consider Appellant's first point, which reads:

"The trial court erred in overruling Appellant's motion to suppress State's Exhibits 1 through 20, as well as Appellant's statement, and admitting them into evidence over Appellant's objection, because the evidence was seized in violation of Appellant's right to be free from an unreasonable search and seizure and due process of law, as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United State Constitution and Article I, sections 10 and 15 of the Missouri Constitution, in that the items were seized pursuant to an illegal arrest without probable cause, as the sole basis of the arrest was the information possessed by Sergeant Jack Merritt that Appellant was an escapee from Utah."

Before trial, Appellant filed a motion to suppress evidence obtained as a result of his arrest by Merritt on September 2, 1992. He followed that with an amended motion to suppress the same evidence. The trial court conducted a pretrial hearing on the motions and denied them.

The State points out that when an accused maintains in a pretrial motion to suppress evidence that it was obtained by an unreasonable search and seizure, but fails to object on that basis when such evidence is offered at trial, any alleged error in receiving such evidence is not preserved for appellate review. *State v. Yowell,* 513 S.W.2d 397, 402[2] (Mo.banc 1974).

The State emphasizes that most of the exhibits numbered 1 through 20 were not objected to at trial on the ground set forth in Appellant's first point. For example, Exhibit 1 (Willard's ledger), Exhibit 12 (a "standard advertising agreement" used by DeRue's company), Exhibit 13 (a "rate card" and a return envelope for advertising copy or checks), and Exhibit 14 (an advertising brochure and a decal used by DeRue's company), were received in evidence at trial without any objection.

When Exhibits 3, 4, 5 and 6 (the checks and receipts regarding Counts I and II) were offered at trial, Appellant objected on the grounds of "relevance and hearsay." When Exhibit 7 (a check pertinent to Count III, which was ultimately dismissed) was offered at trial, Appellant made the same "relevance and hearsay" objection. When Exhibits 8 and 9 (a check and receipt pertinent to Count IV, which was ultimately dismissed) were offered at trial, Appellant made a "hearsay, foundation and relevance" objection. When Exhibits 10 and 11 (the check and receipt regarding Count V) were offered at trial, Appellant objected that they were "hearsay and ... not relevant." When Exhibit 17 (a receipt and check pertinent to the incident at lawyer Bussell's office on September 2, 1992) was offered at trial, Appellant objected on the grounds of "relevance," "hearsay" and "surplusage."

 Exhibit 2, as noted earlier, was Appellant's briefcase. Appellant fails to explain how he was prejudiced by its admission in evidence. Nothing in the record indicates there was anything incriminatory about the briefcase. It was merely the container from which Appellant removed checks and other documents.

An accused seeking a new trial because of alleged error in admission of evidence has the burden of proving both error and prejudice in the reception of such evidence. *State v. Strothers,* 798 S.W.2d 723, 725[5] (Mo.App. S.D.1990); *State v. Minton,* 782 S.W.2d 134, 136[1] (Mo.App.E.D.1989). We hold Appel-

lant has demonstrated no prejudice, hence no basis for reversal, in the admission of the briefcase in evidence.

This leaves only Exhibits 15, 16, 18, 19 and 20. According to the index of exhibits in the transcript, all are documents.

Appellant has not presented to this Court any of the exhibits about which his first point complains.[4] Production of exhibits in appellate courts in criminal cases is governed by Rule 30.05, Missouri Rules of Criminal Procedure (1994). The rule provides that any exhibit not produced in compliance with it may be considered by the appellate court as immaterial to the issues on appeal.

It was Appellant's duty to file a complete record including all evidence necessary to determine all questions presented to this Court for review. *State v. Harris*, 620 S.W.2d 349, 356[16] n. 4 (Mo.banc 1981). Appellant makes no contention that the exhibits were unavailable to him for production in this Court.

■ An appellate court will not convict a trial court of error for receiving in evidence an exhibit not produced as part of the record on appeal or filed separately in the appellate court as authorized by Rule 30.05. *State v. Madden*, 394 S.W.2d 317, 320[4] (Mo.1965). Consequently, in addition to the reasons already given for rejecting Appellant's claim of error regarding Exhibits 1 through 14 plus 17, the claim must be rejected for the additional reason that those exhibits were not produced in this Court. For the same reason, Appellant's claim of error regarding Exhibits 15, 16, 18, 19 and 20 is rejected, being ineligible for appellate review.

The only claim of error left in Appellant's first point concerns his statements to Merritt after arrest. This issue requires a narrative of the circumstances preceding the arrest. In reciting them, we are mindful that the evidence and reasonable inferences arising from it are to be stated favorably to the trial court's ruling. *State v. Blair*, 691 S.W.2d 259, 260[1] (Mo.banc 1985), *cert. granted*, 474

U.S. 1049, 106 S.Ct. 784, 88 L.Ed.2d 762 (1986), and *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987).[5] We disregard contrary evidence and inferences, and affirm the trial court's ruling if the evidence is sufficient to sustain that court's finding. *Id.*, 691 S.W.2d at 260[2].

So viewed, the evidence at the hearing on the motion to suppress established that a Springfield businessman notified the Missouri State Highway Patrol that he had received a telephone solicitation from someone representing himself as a member of the Patrol. The businessman asked whether the Patrol was soliciting funds.

Merritt contacted Kenneth Sears (mentioned earlier in this opinion) at the office of the Missouri State Troopers Association in Jefferson City. Sears informed Merritt there was no solicitation by the Patrol in the Springfield area. Sears also informed Merritt that St. Louis County had an active investigation of a solicitation scheme where callers were representing themselves to be members of police associations or police organizations.

Merritt phoned Sergeant John Tierman of the St. Louis County Police Department. Tierman stated his department had an active investigation and one of the suspects was Tom Morin. Tierman also told Merritt he had "information documented that Thomas Morin was an escapee from Utah."

On the afternoon of September 2, 1992, Lieutenant Morris E. Patrick of Troop D of the Missouri State Highway Patrol received a phone call at headquarters in Springfield from lawyer Bussell (mentioned earlier in this opinion). Bussell told Patrick he had received a phone call from a Mike Delaney who represented himself as a highway patrolman "soliciting funds for their organization." Bussell asked Patrick whether this was an authentic solicitation.

Patrick told Bussell there was no Mike Delaney in Troop D and no "uniformed officer in the state by that name." Patrick

---

4. Our descriptions of the exhibits in this opinion are based on the index of exhibits and testimony in the transcript.

5. An unrelated holding in *Blair* was overruled in *State v. Mease*, 842 S.W.2d 98, 106 (Mo.banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

informed Bussell there was an investigation under way on "suspected fraud by solicitation." Patrick assured Bussell he would have the investigator contact him.

Patrick then relayed to Merritt the information supplied by Bussell.

Merritt went to Bussell's office. Bussell told Merritt the person who had solicited him was Mike Delaney with the Missouri State Highway Patrol. Bussell gave Merritt a receipt Willard had brought Bussell, together with a copy of a check Bussell had prepared. The receipt bore the initials "MD." Merritt inferred they stood for Mike Delaney.

Merritt confronted Willard at Bussell's office. Willard informed Merritt he was there to pick up money from Bussell for someone he knew as Mike Delaney and Tom Morin.

Merritt went with Willard to the parking lot and arrested Appellant. Asked the reason for the arrest, Merritt testified:

"I advised [Appellant] that I had information that he was an escapee from Utah.

Q. Okay. Any additional information that you had before you arrested him?

A. I also advised him that he was under suspicion for the solicitation that he was involved in doing."

At Troop D headquarters, within an hour after arresting Appellant, Merritt confirmed through the National Crime Information Center ("NCIC") that there was "an active warrant from Utah" for Appellant. Merritt also learned through the Missouri Uniform Law Enforcement System ("MULES") that there was an "active misdemeanor warrant" for Appellant from Jackson County. During Merritt's interview with Appellant, Appellant confirmed he knew he was wanted by Utah.

Appellant's theory that his arrest was unlawful is succinctly articulated in the argument following his first point:

"At the time Appellant was placed under arrest, Sergeant Merritt had no knowledge of an active warrant giving him authority to place Appellant under arrest. He only knew that Appellant was an escapee from Utah. That does not suffice as probable cause to effect an arrest.

. . . .

[A]ppellant does not contend that his arrest was unreasonable merely because information as to his escape status was obtained over the telephone from another police officer. It was unreasonable because the facts given to Sergeant Merritt were not sufficient to warrant a reasonably prudent person to believe that there was a warrant outstanding from the State of Utah for Appellant's arrest. The only information given Sergeant Merritt was that Appellant was an escapee from the State of Utah. There was no information that there was an outstanding warrant authorizing Appellant's arrest by Missouri authorities."

Section 548.141, RSMo 1986, a part of Missouri's "Uniform Criminal Extradition Law," reads:

"The arrest of a person may be lawfully made . . . by any peace officer . . . without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by . . . imprisonment for a term exceeding one year . . . ."

The State does not argue that Appellant's arrest was lawful under § 548.141, seemingly conceding that Merritt's knowledge about Appellant being an escapee from Utah did not constitute reasonable information that Appellant was charged in that state with a crime punishable by imprisonment for a term exceeding one year. Instead, the State maintains Merritt had probable cause to arrest Appellant for the class D felony of unlawful merchandising practices regarding the solicitation of lawyer Bussell.

Appellant replies that Merritt did not arrest him for unlawful merchandising practices; consequently, the State is foreclosed from endeavoring to justify the arrest on that basis. Implicit in Appellant's position is the assumption that if the arrest was unlawful, Appellant's incriminatory statements to Merritt were inadmissible as "fruit of the poisonous tree."

*State v. Kilgore,* 771 S.W.2d 57 (Mo.banc 1989), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989), demonstrates

Appellant's assumption is not always correct. In *Kilgore*, the State conceded the accused's arrest was unlawful. *Id.* at 61. Therefore, said the Supreme Court of Missouri, the question was whether the causal chain between the arrest and the accused's subsequent statements was broken by intervening events and whether the statements were sufficiently an act of free will to purge the primary taint. *Id.*

Factors to be considered in making that determination are: (1) the issuance of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Id.* at [1].

In *Kilgore,* the accused—suspected of murder, robbery and kidnapping—was arrested at 10:00 a.m. After being advised of his Miranda rights, he denied guilt. He remained in custody until the next morning, when warrants were issued against him for those crimes. About 8:30 a.m. that date, he was again advised of his Miranda rights and told of the warrants. He then admitted culpability.

Applying the four factors set forth above, the Supreme Court of Missouri held the statements were voluntary and admissible. *Id.* at 62. First, the accused was advised of his Miranda rights on six different occasions during questioning. Second, the Court noted several hours between arrest and confession have been deemed sufficient to purge the taint, as has as little as 45 minutes. *Id.* at 61. Third, a significant intervening circumstance occurred between arrest and confession, i.e., the accused was officially charged with the three crimes and notified of the charges. *Id.* Fourth, even if the purpose of the arrest were considered pretextual, that fact alone was insufficient to taint an otherwise voluntary confession. *Id.* at 61–62. The taint of a pretextual arrest can be purged by subsequent events occurring prior to interrogation. *Id.* at 62. The notice to the accused in *Kilgore* of the filing of official charges served to purge the taint. *Id.*

■ Here, Merritt advised Appellant of his Miranda rights upon taking him into custody in the parking lot at Bussell's office.

Later, at Troop D headquarters, before questioning Appellant, Merritt again advised Appellant of his Miranda rights.

As we understand the evidence, Merritt questioned Willard, received Willard's ledger, received Appellant's briefcase from Willard, and released Willard before questioning Appellant. Within an hour after the arrest, Merritt received NCIC confirmation that there was a Utah warrant for Appellant's arrest and the MULES information about the Jackson County warrant for Appellant's arrest. Viewed favorably to the trial court's ruling on the motion to suppress, the evidence supports an inference that Merritt had this information before Appellant made his incriminatory statements. That factor, like the issuance of the warrants in *Kilgore,* constituted an intervening circumstance.

Additionally, there was no flagrancy in Merritt's arrest of Appellant. Merritt had reliable information that Appellant was an escapee from Utah. Nothing in the record indicates Merritt doubted his authority to arrest Appellant on that basis. Furthermore, although Merritt chose not to arrest Appellant for an unlawful merchandising practices offense, Merritt had probable cause to do so. Merritt had information that someone representing himself as Mike Delaney, a member of the Missouri State Highway Patrol, had solicited funds from Bussell. Merritt knew those representations were false. Merritt also knew the Patrol had no solicitation program under way in the Springfield area. Merritt possessed the receipt given Bussell by Willard, bearing the initials "MD." Merritt inferred they stood for Mike Delaney. Willard told Merritt he was at Bussell's office to pick up money from Bussell for someone he (Willard) knew as Mike Delaney and Tom Morin. Willard accompanied Merritt to the parking lot and pointed out Appellant as that individual.

It is inferable that Appellant did not view Merritt's conduct as flagrant or oppressive. Appellant asked Merritt—not Appellant's courier, Willard—to bring Appellant items from his motel room.

Applying *Kilgore,* we hold that even if Appellant's arrest was unlawful—an issue we

need not decide [6]—the causal connection between the arrest and Appellant's incriminatory statements was broken by the circumstances described above, thereby purging any taint. Appellant's first point is denied.

Appellant's third point concerns the prosecutor's closing argument. Endeavoring to convince the jury that the evidence satisfied the elements set forth in the instructions, the prosecutor said: ,

> "... the defendant wilfully stated that he was—he told Tom Martin he was Mike Delaney. He told all the other victims that he was either a member of the patrol or a member of the Springfield Police Department. Okay?
>
> And that the money that he was soliciting would be used to benefit either the widows and families or crippled children. Okay? That's a contested issue. Mr. Van Arkel is going to tell you that he didn't do it. But we'll get into that in a second.
>
> And fifth, that the statements made were false. Well, you can't have it both ways. Mr. Morin can't come in here and say, 'Yeah, I made those statements and they're not false.' Mr. Van Arkel has to tell you—
>
> MR. VAN ARKEL [7]: Your Honor, I'm going to object. Can we approach the bench?
>
> THE COURT: Yes."

At a bench conference, Van Arkel asserted the prosecutor's statement referred to Appellant's "lack of testimony." [8] The prosecutor replied that his remark was not a comment on Appellant's failure to testify.

Van Arkel moved for a mistrial. The trial court denied the motion.

Appellant's third point maintains the ruling was error because the prosecutor's argument was a comment on Appellant's decision not to testify. Appellant characterizes the

argument as "a direct and certain statement to the jury that Appellant did not come in and testify before the jury."

A direct reference to an accused's failure to testify is made when the prosecutor uses words such as "defendant," "accused" and "testify" or the equivalent. *State v. Lawhorn*, 762 S.W.2d 820, 826[7] (Mo.banc 1988). An indirect reference is one reasonably apt to direct the jury's attention to an accused's failure to testify. *Id.* at 826[8]. Although a direct reference to the failure of the accused to testify will almost invariably require reversal of the conviction, an indirect reference is improper only if there is a calculated intent demonstrated by the prosecutor to magnify that decision so as to call it to the jury's attention. *Id.* at 826.

Here, the prosecutor did not use the words "defendant," "accused" and "testify." While the presence or absence of such words is helpful in determining whether a comment is a direct and certain reference to an accused's failure to testify, an appellate court is not confined to any single talismanic formula in conducting its inquiry, and it must take into consideration the unique facts of each particular case. *State v. Johnson*, 702 S.W.2d 65, 74 (Mo.banc 1985).

While the prosecutor did use Appellant's name, it appears to have been in the context of emphasizing that Appellant was presenting two theories of defense: (a) the statements the caller made to the victims were not false, and (b) there was insufficient evidence to establish that Appellant made them.

The prosecutor correctly anticipated the argument of Appellant's lawyer. In his argument, Appellant's lawyer told the jury there was no proof that the statements made

---

**6.** *State v. Miller*, 108 Ariz. 303, 497 P.2d 516 (banc 1972), held that where an officer made an arrest for violation of an allegedly unconstitutional statute, which violation was less serious than an offense for which the accused was then under investigation, the arrest and resulting search were lawful provided there was probable cause to make the arrest for the more serious offense and the arrest for the lesser offense was not merely a sham or subterfuge for the purpose

of obtaining evidence to have probable cause to arrest for the more serious offense. *Id.* 497 P.2d at 518–19[1].

**7.** Public Defender Jon Van Arkel, who represented Appellant at trial.

**8.** Appellant did not testify at trial.

by the caller were false, and no proof that Appellant made the calls.

The thrust of the prosecutor's argument, as we divine it, was that the jury should view the defense strategy as ambivalent and reject it. We cannot ascribe any other meaning to the phrase "you can't have it both ways." We need not comment on the tactical value of that argument.

We hold the prosecutor's argument did not amount to a direct reference to Appellant's silence. It is doubtful that the argument was even an indirect reference. If it could be construed as an indirect reference, there is no indication of an intent by the prosecutor to call the jury's attention to Appellant's failure to testify. Consequently, the trial court did not err in denying Appellant's motion for mistrial. *Lawhorn*, 762 S.W.2d at 826–27.

We have studied the cases cited by Appellant. The prosecutor's argument here was too different from the arguments in those cases for them to be controlling. Appellant's third point is denied.

Appellant's fourth point assigns error in the trial court's denial of his application for continuance. It was filed February 26, 1993, three days before trial. It averred Appellant intended to call Robert Best of Las Vegas, Nevada, as a witness, but he was unavailable "during the week of March 1, 1993."

■ Granting or denying a motion for continuance rests within the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent a strong showing of abuse. *State v. Sweet*, 796 S.W.2d 607, 613 (Mo.banc 1990), *cert. denied*, 499 U.S. 932, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991). Furthermore, a party seeking reversal because of the denial of his motion for continuance bears the burden of demonstrating prejudice resulting from the denial. *Id.*, 796 S.W.2d at 613.

Rule 24.09, Missouri Rules of Criminal Procedure (1993), requires, among other things, that an application for continuance be accompanied by affidavit setting forth the facts upon which the application is based, unless the adverse party consents that the application be made orally. No such consent is shown here.

■ Appellant's application was unaccompanied by an affidavit. That alone was grounds for denial. *Sweet*, 796 S.W.2d at 613.

Furthermore, Rule 24.10 requires an application for continuance because of the absence of a witness to show, among other things, facts demonstrating reasonable grounds for belief that the attendance of such witness will be procured within a reasonable time. No such allegation appears in Appellant's application. It states only that a continuance is sought "until such time as Robert Best can be present to testify." Denial of an accused's motion for continuance which was deficient in that respect was held not to constitute an abuse of discretion in *State v. Green*, 647 S.W.2d 902, 903–04[2] (Mo.App.S.D.1983).

■ Appellant's motion set forth the testimony he expected to adduce from Best. At trial, the prosecutor stipulated to some, but not all, of the facts Appellant anticipated proving by Best.

Appellant presented testimony by Deborah Ikerd, who had ten years' experience in telemarketing. She testified that people receiving telephone solicitations misunderstand the presentations, that such persons complain about the solicitors, that telemarketers have monitoring systems and scripts to ensure that solicitors make no misrepresentations, and that it is considered ethical for solicitors to use "pseudonyms." According to Appellant's application for continuance, that was the substance of the testimony Appellant expected from Best.

Because of the prosecutor's stipulation and the testimony of witness Ikerd, Appellant has shown no prejudice from the denial of his application for continuance. His fourth point is denied.

Appellant's final complaint is that the trial court erred in denying his application for change of venue. Appellant maintains the inhabitants of Greene County were prejudiced against telemarketers and had been subjected to "libelous and defamatory articles in the newspaper and television stations" about him.

Whether to grant or deny a change of venue because of pretrial publicity is a matter left with the trial court's sound discretion. *State v. Leisure*, 749 S.W.2d 366, 376[9] (Mo.banc 1988), *cert. denied*, —— U.S. ——, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). An abuse of discretion exists only when the record shows that the minds of the inhabitants of the county are so prejudiced against the accused that a fair trial cannot be had there. *Id.*, 749 S.W.2d at 376. The relevant question is not whether there was publicity surrounding the crime, nor whether the prospective jurors in a case remembered the publicity or the crime; the critical question is whether the jurors had such fixed opinions that they could not judge impartially the guilt of the accused. *Id.*

At a pretrial hearing on the application for change of venue, eleven people testified. None had ever heard of Appellant. One of the eleven said she was annoyed by calls from telemarketers because they invaded her privacy. Another said he was bothered by such calls when they occurred while he was doing something he did not want to interrupt.

Such responses are not surprising. Indeed, it is remarkable that only two people expressed that attitude.

During voir dire of the jury array for Appellant's trial, the prosecutor asked whether anyone had ever heard of Appellant. No member of the venire responded.

The prosecutor asked whether anyone would have a problem sitting on a jury where telemarketing was involved. One member said she would be "very prejudiced." Another said she would have "a little bit" of a problem. The trial court excused both for cause.

Appellant does not direct us anywhere else in the record to support his final point. Nothing in the record indicates the panel of twenty-seven from which the twelve jurors and the alternate were chosen included anyone who could not judge guilt or innocence impartially. Indeed, as reported in the first paragraph of this opinion, the jury deadlocked on two of the five counts.

Appellant's final point is denied.

Judgment affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.